forward in works to Workers' Compensation Mayor Galless I'm going to call the next case. 16-05-16, 0331-. Mary Lee Corp-. Industrial Workers' Compensation-. Good afternoon, may it please the court, Mr. Short, my name is Cheryl Introvaya, I represent Gilston Mary Lee in this appeal. There were three issues brought to the attention of the appellate court in this matter, which is a little connection, and attached to the issue of notice we had a question of law that we wanted to put forth to this court, which was basically can we use the notice standard that is used for repetitive trauma cases in an accident involving a traumatic injury with an actual date and time, place. And we had to bring this issue to your attention because the commission in this case used the manifest wait, or not manifest wait, that's our standard of review, sorry about that, the manifestation date as the basis for finding notice in this matter. Mr. Bunn was employed at Gilston Mary Lee as an over the road trucker. He was hired as an over the road trucker in 2002, he has an injury, when he gets out of his truck he feels pain coming down the steps, but his major problem was he got out of the truck, he went down to release the fifth wheel pin, and when he pulled it he had an electric shock shoot through his neck, down his arms, to where he honestly thought that he had been electrocuted and was looking for a short on the truck, it was so severe. That happened on August 13, 2009. There's no dispute about it, one of the few things Mr. Short and I probably agree on in this case. So it's more than 45 days, right? It was 67 days, he originally stated at the hearing that he gave notice to Gilster a month after the accident, and that was brought out on direct examination, and then on cross examination they went back through the recorded statement that was provided to Gallagher Bassett and Anita Green on October 21st, at which time he stated the first time he advised Gilster of the accident was on October 19th, and the attorney for Gilster Mary Lee clarified that, and Mr. Short even clarified that when he got back up and did redirect. So while we have a commission decision saying he gave notice on September 19th, that... Because that hinges on the manifestation date, if in fact the 45 day notice requirement applies, that's essentially jurisdictional under the case law, he would be out, correct? It would be out, Your Honor, but based on what they said, they basically stated that it was not fatal to the petitioner's case because he became aware of the connection of his then current condition of ill-being and his injury in September, which is not correct, but in any event, and then reported it to the respondent on October 19th, 2009. But generally that's drawn from a repetitive trauma case, and that's not the case here, is it? No, it's not, Your Honor, and that's why we brought this to you as a question of the law, and although there were no cases cited in support of it, I did find one after we received Mr. Schwartz's brief, and it was the Tolbert case, and in Tolbert, it actually happened, but the facts in Tolbert are actually more akin to an occupational disease case. Mr. Tolbert had chest pains at work, he went to the ER on August 26th, 28th, something like that, went back to work on September 1st, and his boss testified that he notified him that he had this problem, thought it might be cancer, they eventually do a biopsy on Mr. Tolbert, and they discover that he has histoplasmosis, and that's in October, that's October 4th, his attorney then writes a letter to the employer on November 8th, saying he's got this condition, and it's from his job. So technically, the employer in Tolbert got notice twice, because the first notice in September would have just been effective notice, I mean, there are many cases where someone, you know, they've had a heart attack, they don't know if it's work-related or not, but they call the boss and say, hey, he had a heart attack, so they have notice of the actual accident. And in Tolbert, they extended the time period, basically saying there is absolutely no way that Mr. Tolbert would have known that he had histoplasmosis before October 4th, which is when they did the biopsy, so we have hearing loss cases and other occupational disease cases, like pneumoconiosis, no one knows when that air particle caused the histoplasmosis, so you kind of get into this, no one knows when it happens, and you have the second standard. Going to the specific, on August 13th, he was attempting to pull a fifth-wheel pin while in the trucker-out assignment, as I understand it, he immediately experienced a sharp pain akin to, like, electric shock, his arm was numb, this was all manifested immediately, correct? That's correct, Your Honor. So you're hanging your head on, this is a traumatic injury case, and there's a specific event you're pointing to, right? Well, as far as we're concerned, if you have an actual date, time, place, that's exactly what's required for a traumatic injury, and that's why we created the manifestation date for repetitive trauma, because there was no actual time, place, you never know which time you moved that widget, was the one that got your arm out of whack. And so we have two distinct standards, but we're asking this court, and like I said, the only case that I could find where it had even been allowed was in Tolbert, but Tolbert, we were dealing with a disease, which I can't understand why it wasn't brought under the ODA in the first place, but even based on those facts, even if his injury date was his last day of work, which was August 26th, the day he had the chest symptoms, he told his boss he had a problem on effective notice, and it goes back to the, well, was the employer prejudiced by this? Or if you change it to the day he finally finds out what his actual condition is, you know, then we're still within the 45 days of that. In this case, he clearly had a traumatic accident, there's no question about that, and it's very difficult to believe that he wouldn't have known that it involved his cervical condition, given the fact that he'd already had cervical conditions previously, and been told, you know, in 2005, hey, you might want to look for different employment because, you know, you could exacerbate this, kind of where we've ended up here. So, with that said, you know, it's our position that notice is a no-brainer in this, and it's 45 days after the accident, we have no notice given to Gilster Mary Lee, both the arbitrator and the commission majority, although they disagreed on the actual was found that notice was given on October 19th, and the calendar is simply 67 days. So we have asked this court to vacate the commission's finding that there was notice that was timely in this case, and also provide some illustration or illuminate the issue as to whether we're going to start using a manifestation wait date for traumatic claims, because I think we would really be using a statute if that's what we were going to do. The other issue that I wanted to address very briefly was the issue of jurisdiction, and the reason that becomes an issue is, and again, it's a manifest way to the evidence standard, so I get that we're going uphill here, so if you can just kind of follow me up the hill. In this case, they basically, they looked at two pieces of testimony, one being Mr. Welker, who was the practice manager, and one being the petitioner. The petitioner said, my last, there was two interviews. The first interview, there's no question it was in Chester. Again, that's our third thing we agree on, right, Mr. Short? That the first interview was in Chester. And the second was, where did the second interview take place? And the petitioner believed that it was in Chester, and Mr. Welker, who was the traffic manager at Gilster Mary Lee, said, no, that happened over in Prairiesville, Missouri, and the reason that I believe that it happened is because this is our policy. This is how we do it. And the commission got really hung up on, well, why would they do this? Why, there's nothing in the record that says why they would do this. Well, they clearly didn't delve into the record very deeply, because there are road tests, and the road test took place in Missouri. The road test is in the record, showing it went from Prairieville to McBride, Missouri, and that is where the Gilster terminal is. So if you're going to have employees take the road test, you're going to go where the truck is, and then why would you go back to Chester to fill out your paperwork to make sure that he's a citizen, so he can work here, and, you know, fill out the W2s and all the rest of it. The commission also didn't address the fact that there were reports of injury from prior claims that Mr. Bunn had that were contained within the record, and these included a Missouri work comp settlement along with two prior claims that were filed in Missouri. And on both of those reports of injury, there's a little box off to the right-hand side, about halfway down. It's midpoint off to the right, and there's a box that says date of hire, or not date of hire, place of hire, and both of them say Missouri. And so I guess the question becomes why would you be filing a claim in Illinois when you filed all of your other claims in Missouri, and those accidents involved injuries that were in Indiana and in Illinois, where you have three bases. It's where you primarily work, it's where the contract was formed, or it's where you were injured. And he wasn't injured in Missouri in either of those two, and the law with over-the-road truckers is basically the same there as it is here, which is there is no fixed place of employment, because you're an over-the-road trucker, which by definition would not have a principled place of employment, meaning the contract had to be completed in Missouri. And in both of those cases, it was a non-event, non-issue, and it was a non-event showing that his place of hire was in Missouri, and it's only now that this is suddenly an issue. So we would ask the court to review that under the manifest way-to-the-evidence standard. We also brought up the issue of the Commission's finding of causal connection, manifest way-to-the-evidence. I mean, it was not disputed that what was seen on the MRI in 2005 was the same as what was seen on the MRI on the day of the accident in 2009. And the only other issue to consider with that is the fact that Dr. Rue believed that Mr. Bunn's injury was incurred because he fell back after he pulled the pin out of the truck. And that's who they gave the great weight to was that opinion. So again, I know that's an uphill battle, but pretty much all we can do with the causation and that standard. But unless you all have any questions on this, that's basically the argument that we have here. Thank you, Counsel. Counsel, you may respond. Counsel? Your Honors, my name is Keith Short. I represent the employee, Mr. Bunn. I'd like to address the question Justice Hudson raised about this whole issue about manifestation. Yeah, where is this manifestation day coming if there was a specific incident at a specific date and time that was obviously traumatic? Right. And I get that. And here's what I decided I would do when that came up. I immediately went through the record because I think that's probably the smartest place to go. First off, my client is not a medical doctor. He doesn't have any medical training. He had never had problems with numbness and tingling in his hands prior to this. And here's what's important. When asked, he said, well, it was after the shock. He said, oh, I thought, we all agree that that's what he says. And there's no evidence to refute that. So I said, what happened next? He says, well, actually, I climbed back into the truck and never noticed anything was wrong. It was on a Friday. I went home. I didn't notice anything until Sunday. So when your Honor said, well, there's immediate onset, that supposes that the onset remained and that it was not a progressive condition. Does that make any difference at all? Well, you know, that's actually... Are you attempting to engraft a discovery rule on the workers' compensation? Well, that already exists. I mean, the court would never allow my client to come in and testify as to causation. Ever. I mean, he can't come in and say, my herniated disc was the result of this. He's not going to lie. I said the discovery rule. Right. But I'm getting... If you have a traumatic event, can you delay the onset to the commencement of the 45-day jurisdictional time limit? Absolutely not. I agree with you. But here's the problem. That requires that you appreciate that that event resulted in some consequence that would require medical opinion. This isn't like he broke his leg. And this isn't like I had a shock and then it never went away. But you're dancing around the issue. The Workers' Compensation Act says, in order to vest the commission with jurisdiction, there must be notice to the employer within 45 days of the event. Did he report it within 45 days of the event? Well, that's the question. When did he know of causation? No. No, of course not. Of course not. It's obvious. Is there a case that says there's a discovery rule engrafted on the workers' compensation? Well, I think counsel kind of cited the one. And she didn't like it. But it does sort of suggest that that exists, where a person can't possibly know. Because they're, one, not qualified. Two, this isn't a situation where his symptoms continued. I have to disagree with you there. Because tell me if my understanding of this record is wrong. He testified that on Saturday, August 15, he awoke to numbness in his left hand, arm, and thumb. He also felt tingling in his entire left arm as well. On Sunday, he noticed numbness in his fingers. On Monday, he noticed numbness in his left wrist location. He continued to notice a numb, cold feeling in both arms. He continued to notice pain and a freezing sensation for approximately two weeks thereafter. You're characterizing that as having no indication there was a problem at all? And I take it you're reading the respondent's brief. Well, is that true or not? Well, I'll read the record, though, which doesn't say what you just read. He says... So that was made up out of whole cloth, all of these? Well, all I can do is read what he testified to. He says, I didn't notice anything until Sunday night. Now, you just read that he said he had numbness and tingling in his hands on Saturday. Okay, so what did he notice the next day? He says, in fact, he says, it was on Friday. I went home. I didn't notice anything until Sunday night. Okay, so what happened on Sunday night? Well, Sunday night, he says... I'll read it. When I was leaving, I noticed a cold on the back of my hand. Now, are we going to suppose that a gentleman with zero education in this environment is going to think pressing on a pry bar is going to make the back of my hand numb? And say, oh, I better call my employer? Any other symptomatology he referred to? What did he say after that? That's critical, too, because I specifically knew this might be coming, and I asked the right questions. I said, which hand? I said, he says, my left arm. This is page 35. I said, okay. He said, it started in my left hand. I said, you previously had a problem with your shoulder. He says, correct. During the time, did you ever have any dysthesia? I started asking him, during your prior problems, have you ever had problems with your left hand? He said, no. He has no experience with this. None at all. I said, do you have any problems with your right side? No. At any point. And then we go on. What's the best case cited in your brief for the proposition that there is a discovery ruling drafted on a worker's compensation? Probably none, Your Honor, because I'm not... Because you cited no cases. Right. I went with what is common sense and what I know that the court would not allow them to testify to. So you leave the obligation of research to us? No. Counsel also agreed with me. This is relatively novel. And actually, what I did was I relied on what the commission, who are the experts, I relied on what they said. So, you know... Never mind. If we get it wrong, and you didn't cite any cases... I understand. And I would suppose if there were cases, counsel also would have a problem where she could pull out cases and pound me to death with them. But the reality is, I have to rely on who the experts are, which is the commission. The commission understood the common sense application here. This is a gentleman who could not possibly have known that prying down on something would cause the back of his left hand to go cold. And then he goes to his doctor, and the moment he tells his doctor, the doctor says, well, you know, it could be from when you were doing that activity. So he tells the employer. And the commission correctly noted that the report filed by the employer, which was signed by Steve Landholt, who they did not bring, who could have easily refuted all this. They could have brought the dispatcher. They didn't bring that. They could have brought his employer. They could have brought all kinds of things. They didn't bring anything. They didn't bring anyone. All this gentleman can do... And by the way, the other issue is, whether I was able to find an obscure site or not shouldn't obfuscate what the truth is and what the ultimate effort is, which is to find the right decision under the law. That should be it. It shouldn't be trickery. It should be that. So, in any event, as soon as his doctor tells him there's a causation for symptoms he's never experienced before in his life, he goes and tells them. Within 45 days, which is what the commission noted, the report is signed by Mr. Landholt. They could have brought Mr. Landholt in. And that goes to the... You want to talk about what could have been done. They said, well, the last element necessary for employment is where the last act occurred. And we say that happened in Chester, Illinois. And they say, no, that happened over in Missouri. And they brought Mr. Welker, who, by the way, didn't hire... Welker didn't have any person. He was not there when he got hired. Clayvin testified that everything occurred in Chester. He never met with anybody back in Missouri. I don't think that's your weakest point. No, it's not. And it shouldn't have been. But that was actually the fight the whole time. That was from the very beginning, which jurisdiction, which is the biggest fight in the brief. I think it just became notice. It just became notice. And we already knew it was notice. That's why I already had this ready to go. I mean, it's... The bottom line is this. Would my client... Could I put him on? And could he have testified there was a causal relationship between prying this bar and the back of his hand going numb and then his hands going numb, symptoms he's never had before? Could he have said that? Would you have allowed him to say that? Of course not. Of course he couldn't have said that. Well, if he was fine until there was this injury pulling the fifth wheel pin and then his hands are numb or cold after that, it doesn't put him on notice there's a problem stemming from this incident? And if it were persistent. But that's not what he testified to. Okay. So I'm going to pin this interview down, but I'm going to pin you down right here, right now. Did he not say or testify that he continued to notice pain and a freezing sensation when he returned to work and for approximately two weeks thereafter? He never said anything about having any symptoms at all after the incident? Oh, no, he did. There was a break. That's what I was trying to explain. This isn't as though I hurt my knee and it never felt better. This is I had this shock I felt, but then it went away Friday. Then it went away Saturday. And then when did it come back? Sunday, the back of my left hand starts going numb. And then it continued for a while, right? And he's supposed to think that this activity that causes a break, symptoms for two days, then it starts at his left hand, you would suppose it would start in his neck and work down his arms, and it didn't work that way. Well, if you got injured in your garage and you were okay for a couple of days and then you started to have persistent symptoms for a couple weeks, you wouldn't relate it back to what happened in your garage because you've never experienced this before? Is that your argument? Absolutely. Okay. Absolutely. Because that to me is just common sense. If I roll my ankle in my garage and three days later I have a blood clot, are you going to suppose that I'm somehow knowledgeable of cause and effect? No, but you know if your hanging your head on the fact that quote-unquote he never experienced these symptoms before, he had this accident, so he's dismissing it as some weird coincidence. No, he thought he got shocked. Got shocked on a specific date and time at work, right? Yeah, he thought he got shocked, but then he found no wires. He's found no loose wires, so he didn't know if he got shocked or not. He didn't know what happened. And that's the problem here. They suppose he knew he was under there and he felt something and it went away, so he thought nothing of it. But it came back. By your own admission it came back. By my own admission it came back. I can't change facts. I wish I could. I wish I could tell my client say this, and so it will somehow suppose that you have more knowledge than a person who's a truck driver ought to have about the fact that the neck might make the hand go numb. I just think that is a remarkably unfair burden to put on someone. In all other respects, I think the commission understood exactly what was going on here. This is a company that does, this is, my position is this. Everything possible to avoid the actual responsibility for an injury that has occurred they will do. Let's make the last act for hiring, even though this gentleman works his entire career in Illinois, let's make him sign something over in Missouri. Let's, you know, she says, well, what are motivationalizers irrelevant? No, it's not irrelevant. Because if you're going to question my client's motivation, it is only appropriate for you to question the conduct and the history that you receive from them as well. Especially if they pick a doctor like Dr. DeGrange, who uses Dr. Rue, and then they say, well, no, we're not going to listen to Dr. Rue. We're going to go back to Dr. DeGrange. They bring in a gentleman who has no information, and the court even kind of confessed that, yeah, that's a red herring. The whole jurisdictional issue is a red herring. They bring in a gentleman who knows nothing about what happened in the hiring of my client. And, by the way, I'll give you, for instance, page 13 of their deposition. They say, Mr. Welker's testimony confirms where the last place of hire occurred. And I'd say, no, go back and read pages 88 and on, because he says, no, I can't say that. But he wasn't there. I think he was there. More than that, he also says, I do hire some people in that facility. That's at the bottom of page 88 and not in 89. When you weigh all this out, you've got a gentleman, sir, who clearly was doing what he said he was doing. No one's ever questioned his credibility, ever. And he says, I didn't know what happened. I didn't think much of it. I kept doing my job. I talked to my doctor. She says, you know, that might have caused it. He tells him. And that's where they want to kill the case. Is that the purpose of the compact? Mr. Sherrod? Yes, sir. Supreme Court Rule 341H is equally applicable to Applebee's as it is to the Epelant. You want to suggest that this is a case where you're talking about attaching to the workers 45-day requirement for jurisdiction of the Workers' Compensation Act. So until he knows of it, you cite no cases for this. 341H says you don't cite a case issued waived. And it equally applies to you. I cited the commission, though. You cited no cases in your brief. Your Honor, we did discuss the Torbert case. And the Torbert case does discuss the Epelant. Counsel, I'm looking at your brief. The entire section of your brief talking about jurisdiction, you don't talk about a case. Not one single case. 17, 18, 19, 20, 21, nothing. Absolutely zero. It's not the way to write a brief, Counsel. I understand, Your Honor. If there's nothing else, thank you. Thank you, Counsel. Counsel, I may reply. I understand that you wanted to ask another question, so I'm going to make sure that you get a chance to ask it. How did you guess? I was listening. What symptomatology? He is saying, look, and he has some intuitive feel with his argument, this guy's not a doctor. Okay? It's a shocking, quote-unquote, event. And basically there was no symptomatology after that for him to put him on. I noticed there was any problem. The resulting pain and numbness had anything to do with this accident on a specific day. I take it you don't agree. And tell us what symptomatology is in the record that would have put a reasonable person, I noticed, look, there was something about this accident that's causing my problem. Well, from my review of the record, the petitioner testified that he had absolutely no issues from 2006 when he was released back to work with a 50-pound weight restriction up until the time that he gets out of his truck and pulls a fifth-wheel pin and has this incredible shock of pain. I mean, it wasn't Yeah, it hurt a little bit after I did this. I mean, he testified that it was like an electric shock, so much so that he actually looked for a wire underneath that may have come undone. But did it go away then after that day? Well, it went away until Sunday. This happened on a Friday. It went away until Sunday. And if I can, and I apologize because all I have is the commission record here, your honors, but in the employer's exhibits there is a copy of the transcript of the conversation between Anita Green and Mr. Bunn as to his description of his symptoms. It wasn't like he just had a cold thumb on Sunday and it was all gone. At some point, if nothing else happened to this man except pulling a fifth-wheel pin and all of a sudden we're having all sorts of issues, I'll give you it that he may not have known it was neck. Now, I think he may have because he'd had problems with his neck before, but whatever it is, it really doesn't make a difference. If all of a sudden, if I'm at work and I'm doing something related to my job and I have something strange happen to me and it hurts really bad, and two days later I start having pains that I haven't had before and nothing else has happened in my life except for X, then somewhere in the back of my mind X becomes a potential cause. Now, it may not be, I mean, very well the commission could look at this and say, you know what, this isn't even a work accident. But that's not so much the point as you just give notice of the accident. The statute doesn't require the petitioner to report causation. They just say give your employer some notice of the accident. And had he done that, even if it was, you know, hey, I was pulling my fifth-wheel off and this pin and it was really bad, I got a lot of pain out of it, don't know if there's anything going to come out of it or not, just wanted to let you know I had this issue. That's all he had to do. He didn't have to say I have cervical stenosis. So it's our position that the statute requires notice on an accident and he did know he had an accident. The fact that he didn't link it up is, you know, that's just how it ended up this way. And I just wanted to correct one thing. There was a statement made that Mr. Welger was not part of the interview process as well. And again, I apologize for moving the commission record and not to yours on appeal. On page 21, Mr. Bunn testified that the orientation was done at Chester, Illinois, down in the basement, and Mr. Welger was the one that gave it to me. So Mr. Welger was there. It wasn't just Mr. Ho. Mr. Welger was Mr. Ho's assistant and he took part in the hiring process with regard to Mr. Bunn, based on Mr. Bunn's own testimony. If there's any other questions, I'll get to them. I don't believe there are. Thank you. Thank you, Counsel Goltz, for your arguments in this matter. If you take them under advice and a written disposition shall issue, you'll stand at brief recess.